**Jodee A. FLOCKHART Plaintiff,**

v.

**IOWA BEEF PROCESSORS, INC., Defendant.**

**No. C 97–2054 MJM.**

United States District Court, N.D. Iowa, Eastern–Waterloo Division.

Dec. 21, 2001.

Roxanne Barton Conlin, Roxanne Conlin & Associates, Des Moines, IA, Ronnie L Podolefsky, Podolefsky Law Office, Waterloo, IA, for plaintiff.

Thomas D Hanson, Dale A Knoshaug, Hanson Bjork & Russell, Des Moines, IA, for defendant.

### ORDER

MELLOY, District Judge.

This matter came on for trial before the Court. The plaintiff alleged sexual discrimination under Title VII, the Equal Pay Act and the Iowa Civil Rights Act. The matter is deemed fully submitted and the Court now enters its findings of fact, conclusions of law, and Order.

## I. FINDINGS OF FACT

### A. *Introduction*

This case arises out of JoDee Flockhart's claim that she was constructively discharged from Iowa Beef Processors, Inc. ("IBP"), because she was the victim of pervasive and on-going sexual harassment by both co-workers and management employees. She also alleges that she received less pay than male peers performing equal work.

Many of the facts are undisputed, but as with most sexual harassment cases, the Court is called upon to resolve some significant factual disparities. The Court's findings are set forth as follows.[1]

### B. *JoDee Flockhart Harassment*

The plaintiff was born on April 5, 1966. She obtained her GED in 1984, and joined the Army in 1985. On September 19, 1988, Ms. Flockhart started with IBP as a

---

1. The sex based language at IBP was extremely coarse and the conduct very degrading. While the Court will certainly not engage in gratuitous use of offensive language, it is necessary to set forth in some detail the conduct which Ms. Flockhart was subject to, including some of the very graphic language which was used by employees and management of IBP.

security officer during the construction of the Waterloo plant. On October 21, 1989, she transferred from security to a temporary construction position. On March 15, 1990, Ms. Flockhart obtained a cut floor position at the Waterloo facility of IBP.

On July 16, 1990, Ms. Flockhart became a supply clerk, earning $5.80 per hour. The supply clerk position is known as a management support position. It is not part of the bargaining unit and is a non-union job. Her job grade for pay purposes was "DD". On October 24, 1994, Ms. Flockhart was promoted to senior supply clerk from pay grade "DD" to paygrade "BB". Ms. Flockhart left her employment with IBP on May 10, 1996.

Ms. Flockhart contends that she was the victim of sexual harassment of one kind or another from the time she began her employment at IBP. The sexual harassment can be grouped into three main categories: sexual touching and assault by a co-employee, David Wisecup; verbal abuse and harassment by Ms. Flockhart's immediate supervisor, Frank Eisermann; and general harassment, including groping and touching, by co-employees. In order to put this dispute into some context, the Court will briefly outline the chain of command at IBP. This is important in connection with the issues concerning notice to supervisors.

As indicated, Ms. Flockhart was in the supply department. She started initially as a supply clerk and was later promoted to senior supply clerk. The supply department is part of the plant engineering department and is under the general supervision of the plant engineer. The chain of command that existed during the entire period of Ms. Flockhart's employment is as follows. Starting with Ms. Flockhart, her immediate supervisor was the supply department manager, which position was occupied during her entire tenure by Frank Eisermann. Immediately above Mr. Eisermann were the engineering su-

perintendents; those positions were occupied by Robert Law, and during the later years of Ms. Flockhart's tenure, by Tim Schelle. The next position in order of the IBP hierarchy was the plant engineer, who had overall responsibility for the engineering department. When Ms. Flockhart first started her employment in the supply department, that position was occupied by Chris Truxel; shortly after Ms. Flockhart began her employment, Mr. Truxel was replaced by Mark Schwenneker, who occupied the position of plant engineer during most of the period of the relevant events in this case. The final person in the chain of command at IBP was the plant manager; that position was occupied by James Schmitz during Ms. Flockhart's entire term of employment at IBP.

### 1. *David Wisecup Harassment*

Ms. Flockhart claims that she was fondled and sexually assaulted by David Wisecup on at least three occasions while employed at IBP.

Mr. Wisecup worked in the engineering department at IBP. His titles included maintenance supervisor, project engineer, and project supervisor during Ms. Flockhart's tenure at IBP. He was not in the direct chain of command between Ms. Flockhart and the plant engineer. However, he was "higher up" in the IBP hierarchy. He was under the direct supervision of the plant engineer. His duties were such that he was required to be in and around the supply department on a daily basis. Ms. Flockhart and the other members of the supply department had daily interaction with Mr. Wisecup, as part of their overall job responsibilities. Mr. Wisecup had no say in Ms. Flockhart's pay, promotion, or other conditions of employment. However, as a person with supervisory responsibility, he could give directions to Ms. Flockhart, and did do so on some

**952**

occasions. For purposes of sexual harassment analysis, this Court finds that Mr. Wisecup was not a direct supervisor of Ms. Flockhart.

Ms. Flockhart testified that the first incident of sexual fondling occurred around 1992, the second in 1993, and the third in 1995. Unlike many cases of sexual harassment, the perpetrator does not dispute the conduct occurred. In fact, Mr. Wisecup believes that it happened on more occasions than Ms. Flockhart recalls. Mr. Wisecup testified, and admitted during discovery, that he fondled Ms. Flockhart on at least five or six occasions. One of the issues that will be discussed in more detail in the section on damages is Ms. Flockhart's belief that she has mentally repressed much of the conduct directed at her while at IBP, and her distress that she can only recall three incidents while the perpetrator of the acts believes that there were as many as twice that number.

Mr. Wisecup claims that the first incident occurred around 1989–1990 and was not unwelcome. Mr. Wisecup takes the position that Ms. Flockhart told Mr. Wisecup that he could fondle her breasts if she was not given a disciplinary report for a particular infraction Ms. Flockhart apparently committed. Ms. Flockhart does not recall this specific incident but denies that any of the incidents were invited by her or in any way welcome. In any event, the Court does not need to resolve this dispute because the Court finds that it is undisputed that all subsequent incidents of sexual fondling were unwelcome. Mr. Wisecup acknowledged in his testimony that he knew Ms. Flockhart did not want him to do it, protested his action, and made it clear that the conduct was very upsetting to her. So that the record is clear, the specific conduct that Ms. Flockhart is complaining of involves Mr. Wisecup putting his hand under Ms. Flockhart's shirt and bra and fondling her breasts, and, on at least one occasion, sticking his hand down her pants.

The first incident that Ms. Flockhart recalls occurred in August 1992 (this may not be the actual first incident since Ms. Flockhart only recalls three of the five or six incidents Mr. Wisecup testified to). Ms. Flockhart testified that she became extremely upset and emotional after this incident. She immediately reported the incident to her supervisor, Frank Eisermann, who then reported it to the plant engineer, Chris Truxel. Ms. Flockhart testified that she prepared a written report of the incident and it was investigated by Mr. Truxel. Ms. Flockhart claims that witness statements were taken from parties who were in the area at the time the incident occurred. Ms. Flockhart claims there was no follow-up and she never received any report back as to the results of the investigation. She also claims that Mr. Wisecup continued to make sexual comments after that.

The second incident Ms. Flockhart recalls occurred in February 1993. Mr. Wisecup put his hands down her pants and up her shirt. She again reported this to Frank Eisermann. Mr. Eisermann said he would take care of it. Ms. Flockhart heard nothing further about the incident. In the meantime, Mr. Wisecup was promoted to a supervisory position.

Before discussing the third incident, the Court will address one of the issues which caused considerable controversy during this litigation and is a matter of deep concern as it relates to the effectiveness of IBP's sexual harassment policy. That policy specifically provides that all complaints of sexual harassment are to be investigated, and that a file is to be maintained concerning the results of those investigations. The policy was routinely breached by IBP. Either complaints were not investigated or, if investigated, no records were

maintained concerning the fact of the filing of the complaint or the results of any investigation. As an example, there is no dispute that the third incident was reported to Mr. Eisermann and Mr. Schwenneker, and that some sort of investigation was done. However, IBP has been unable to find, or provide, any records concerning that investigation. Consequently, the Court has no assurance, or confidence, that IBP's inability to locate any records from its investigation of the August 1992 or February 1993 incidents is in any way indicative that Ms. Flockhart did not give a statement or that the incidents were not reported. In fact, given the history of this case and Ms. Flockhart's strong reactions to the incidents, this Court concludes that, in fact, Ms. Flockhart's testimony is credible and she did report all three incidents to IBP management.

The third incident reported by Ms. Flockhart occurred in either 1994 or 1995. There is a dispute about when the incident actually happened. While Ms. Flockhart testified at trial and in deposition that the incident occurred in November 1995, this testimony conflicts with her Iowa Civil Rights complaint in which she stated that the incident occurred in 1994. Ms. Flockhart maintains that the incident occurred in November 1995 and attributes her misstatement in her Iowa Civil Rights complaint to her extreme emotional distress at the time it was filed.

The record is very conflicting on this issue. As indicated, the easiest way to resolve the dispute would have been to have access to IBP's records of the investigation which was conducted immediately after the incident occurred. However, those records are not available and have not been produced by IBP. Nonetheless, the Court believes that based upon the best evidence available, Ms. Flockhart's more recent recollection that the incident occurred in November 1995 is supported by the weight of the evidence.

This date is supported by the testimony of both Ms. Flockhart and Mr. Wisecup. Others who thought it may have occurred in 1994 are individuals who were somehow involved in the investigation, but for whom this was not as significant an event as it was to the two participants. This Court finds particularly relevant defendant's Exhibit "D". Exhibit "D" is a report of the investigation of JoDee Flockhart's complaint conducted after she left IBP in May 1996. This investigation was conducted by IBP's EEO Coordinator, Gail Kinsey Thompson. In her investigation, Ms. Kinsey Thompson reports on an interview she had with Frank Eisermann on August 29, 1996. Mr. Eisermann reported that the most recent incident with Dave Wisecup occurred one year prior to the date of the interview, i.e., in 1995.

At trial, Mr. Wisecup indicated that he thought the incident occurred in 1994 or 1995, but admitted on cross examination that he had testified at deposition it was in 1995, or before Ms. Flockhart left in 1996. Mr. Wisecup also testified that when he was counseled by Mr. Schwenneker, following the third incident, to stay away from Ms. Flockhart he had already moved into the Main Administration Building and was occupying an office which had previously been occupied by an individual by the name of Mr. Lee. Mr. Schwenneker testified that the counseling session occurred within a day of Ms. Flockhart reporting her complaint about the third incident to Mr. Eisermann. Mr. Lee did not leave IBP's employment until late 1994. The record is somewhat unclear as to the exact date when Mr. Wisecup moved into Mr. Lee's office, however, the Court does note that Mr. Wisecup's personnel file shows that he received a promotion from project engineer to project supervisor on

January 1, 1995. This evidence together with Mr. Wisecup's prior testimony that the incident occurred in 1995 or 1996 lends strong support to Ms. Flockhart's recollection that the incident occurred in late 1995.

Having considered all the evidence, the Court finds that Ms. Flockhart's testimony as to the date the incident occurred, that is, November 1995, is the most credible. Consequently, that is the date the Court will find as the date of the third incident testified to by Ms. Flockhart.

Turning to the incident itself, it is undisputed that Mr. Wisecup sexually assaulted Ms. Flockhart. He groped her breasts and put his hands down her pants. Ms. Flockhart again became very emotionally upset by the incident and immediately reported it to Mr. Eisermann, who reported it to Mr. Schwenneker.

All witnesses agreed that Mr. Schwenneker was advised of the third incident and conducted some type of investigation. During Mr. Schwenneker's interview of Ms. Flockhart, Ms. Flockhart asked to see her report of the first incident (the 1992 incident) and the results of that investigation. Mr. Schwenneker advised her that no such records existed. This is the first time Ms. Flockhart became aware of the fact that the records concerning the prior incidents were no longer in existence.

Mr. Schwenneker's investigation included an interview of Ms. Flockhart, Mr. Wisecup, and other members of the supply department. Mr. Schwenneker claims that Mr. Wisecup denied that the incident occurred, and that he was unable to resolve the conflict in the testimony. Ms. Flockhart was advised by Mr. Schwenneker that Mr. Wisecup denied the conduct and Mr. Schwenneker was unable to determine who was telling the truth. The net result of the investigation was a directive to both parties that they were not to have contact with each other. This was not a satisfactory resolution since it was virtual-

ly impossible for Ms. Flockhart and Mr. Wisecup to avoid all contact with each other. Mr. Wisecup's job required him to frequently be in the supply department. Both parties acknowledged it would be impossible not to have daily contact through the normal course of their job responsibilities.

The facts of Ms. Flockhart's complaint and Mr. Schwenneker's subsequent investigation were made known to the plant personnel director, Mark Gordon, as well as the plant manager, Jim Schmitz. It should be noted that although Mr. Gordon had overall responsibility for EEO matters within the plant, he did not ask to see any of the documentation which resulted from Mr. Schwenneker's investigation, nor did he personally participate in the investigation in any way. Likewise, he did nothing to ensure that the investigation was documented and that a file was maintained as required by IBP's sexual harassment policy.

One of the central factual disputes in this case concerns when Mr. Wisecup confessed his involvement with Ms. Flockhart to IBP management. IBP takes the position that it was not aware that Ms. Flockhart's allegations were true until after this lawsuit was filed when Mr. Wisecup purportedly admitted to IBP's former attorneys that he had, in fact, groped and assaulted Ms. Flockhart on at least as many occasions as she claimed. IBP then took disciplinary actions against Mr. Wisecup, including loss of bonus and a suspension without pay.

Mr. Wisecup testified, however, that when confronted by Mr. Schwenneker in 1995, he initially denied that the incident occurred but then went back to Mr. Schwenneker the same day and advised him that he had previously lied and had, in fact, groped Ms. Flockhart as she claimed. Mr. Schwenneker denies that the subse-

quent conversation and admission ever occurred. Again, without repeating the obvious too many times, it would have been extremely helpful to have the interview notes and complete investigative file on this incident in order to resolve this dispute.

That said, in resolving this difficult credibility issue, the Court is inclined to believe Mr. Wisecup. Mr. Wisecup has already come forward, put his career in jeopardy, and admitted that the incidents occurred. It is difficult to believe that Mr. Wisecup would jeopardize his career at IBP by telling the truth in 1998, and then commit perjury about the date that he made his initial admission. In fact, IBP presented testimony that when Mr. Wisecup made the admission in 1998, he was concerned about the Bill Clinton/Monica Lewinsky situation and made a comment to the effect that he did not want to have to lie under oath. It is hard to conceive that an individual who would make a confession in 1998 because of his concerns about perjury would then turn around and commit perjury on the issue of when the admission initially occurred. This Court believes that Mr. Wisecup did make the admission in 1995, and that IBP was aware of the incidents and took no corrective action other than telling the parties not to work together.

There is also some support for this conclusion from Mark Gordon's testimony. Mr. Gordon testified that he had been told by Mr. Schwenneker, at the time of the incident, that there was some truth to Ms. Flockhart's allegation. Mr. Gordon did not follow up on what Mr. Schwenneker meant by that comment, conducted no further investigation on his own, and, as indicated, did not verify that the investigation was documented. This Court believes that Mr. Schwenneker's comment lends support to the conclusion that Mr. Wisecup did confess in 1995 and that IBP thought the

matter could be resolved by a strong warning to Mr. Wisecup to stay away from Ms. Flockhart. In fact, even Ms. Flockhart acknowledges there were no further problems with Mr. Wisecup after the third incident.

The failure to take corrective action is also significant for the reason that Ms. Flockhart was advised that Mr. Wisecup had denied the incident, and that Mr. Schwenneker was not able to reconcile the differences in the statements. This response, coupled with the fact that Ms. Flockhart was advised all records of her prior complaints were missing, only reinforced Ms. Flockhart's legitimate concerns that sexual harassment was not taken seriously at IBP, and that she could not expect that IBP would take any effective remedial action.

### 2. *Maintenance Department Harassment*

The plaintiff was subjected to almost daily harassment by maintenance department employees. As part of the plaintiff's job responsibilities she would work at the supply counter, log-in deliveries, and assist in unloading trucks. On an almost daily basis, the plaintiff would be called a "cunt," "slut," "whore" and "bitch" by maintenance department employees who would come to the counter to pick up parts. Comments would also be made about the plaintiff's breast size. In addition, gender-based comments were made to the effect that the plaintiff should not be working but rather home "servicing her husband." Also, conduct such as cat calls, lip licking, and crotch grabbing was a frequent occurrence in the presence of the plaintiff. Cartoons which depicted derogatory comments towards women and gays were also frequently passed around.

In addition to the gender based comments and gestures, three employees on

one occasion offered the plaintiff $50 to see her breasts. On another occasion a maintenance worker grabbed her from behind while she was unloading a truck at the UPS dock. Much of this conduct occurred in the presence of Frank Eisermann, the plaintiff's immediate supervisor. In addition, the plaintiff specifically told Mr. Eisermann about the grabbing incident at the dock. She was extremely angry and crying at the time it occurred. The plaintiff also complained to Mark Schwenneker, Tim Schelle, and Bob Law.

The plaintiff's testimony concerning the comments directed towards female employees was corroborated by a number of other witnesses. For instance, Ann Macheak, a lab employee and inventory clerk in the shipping department, corroborated much of the plaintiff's testimony. She said there was frequent use of the word "fuck" and comments about women's body parts. When she complained to a supervisor, the supervisor responded that: "... it was a slaughterhouse, he was a former Marine, and that made it acceptable." She corroborated that sex-based profanity was very common in the supply area. Sometimes complaints to supervisors would result in the situation getting better for short period of time, but then the conduct would resume.

John Wilson is a long time employee of IBP, who had frequent contact with the plaintiff. He would regularly hear the plaintiff being called a "dumb bitch" and other derogatory, gender-based comments. It was his recollection that the "groping and feeling" of females was commonplace throughout the IBP plant in Waterloo. Management personnel would often be around when the comments were being made.

Bob Wilson, another IBP employee, testified that JoDee Flockhart was subjected to almost daily insults by co-employees. In particular, he corroborated Ms. Flock-

hart's testimony that Ed Shaw was the person who made particularly derogatory comments. Mr. Wilson recalled one incident when Mr. Shaw had asked Ms. Flockhart to "... show me your tits." Mr. Wilson testified that the conduct towards Ms. Flockhart was consistent with the general conduct towards female employees in which they were called "cunt," "slut," "whore" and "bitch" on a daily basis. And again, these comments were often made either in the presence of, or by, management employees.

A particularly compelling witness was Sara Hermann. Ms. Hermann worked as a clerk in the personnel department, which is adjacent to the main hallway at the Waterloo IBP plant. During shift changes and lunch breaks, there would often be several hundred people coming and going through that hallway. She testified that the harassment towards females in that hallway was so severe that she would not go to the restroom unless she was accompanied by a supervisor. If there was not a senior management person present when she went through the hall, she would be subjected to the same type of comments as testified to by Ms. Flockhart, Mr. Wilson and others. Even Mr. Gordon, the personnel director, conceded the main hallway was a problem at times and that occasionally supervisors would monitor the hall.

Ms. Hermann also testified that she herself was the victim of an inappropriate comment by the plant manager, Jim Schmitz. When she complained to the personnel director, Jack Novak (Mark Gordon's predecessor), Mr. Novak said Ms. Hermann had been told not to go down to Mr. Schmitz' office by herself. Consequently, she avoided any contact with Mr. Schmitz for six to eight months. Mr. Novak also indicated to Ms. Hermann that it would be difficult for her to continue her employment at IBP if she pursued a matter against the plant manager.

When Mr. Gordon became the personnel director, he was also made aware of the allegations made by Ms. Hermann against Mr. Schmitz. Like most sexual harassment complaints at IBP, there is no documentation concerning the complaint or any investigation.

Without belaboring the issue, there is also testimony by other IBP employees about general harassment of female employees, including female employees who were harassed when they refused to date certain male employees. Witnesses also testified to the frequent placement of "pig penises" between the conduit and wall near the women's restroom, as well as obscene drawings on the walls by the women's restrooms. There was also testimony corroborating the plaintiff's statements that she was frequently called a "dumb bitch" by the maintenance employees.

There was also extensive testimony that the taunting, cat calls and derogatory comments directed towards the IBP female employees was a very common occurrence in the company lunchroom. This occurred even when supervisory and management level employees were in the lunchroom eating. Based upon the totality of the evidence, there can be no doubt that IBP was well aware of the comments being made towards its female employees in general, and the plaintiff in particular. Although there were occasional attempts to temper the tone of the comments, those attempts were sporadic and generally ineffective.

The plaintiff was the victim of this type of gender-based comments, taunting, and physical touching during the entire tenure of her employment at IBP. The Court finds credible her testimony that the cumulative effect of this conduct, coupled with the Dave Wisecup incidents described above, and her treatment by Frank Eisermann, led her to a breaking point and her ultimate decision that she could not continue her employment at IBP.

### 3. *Frank Eisermann Harassment*

The third major area of harassment as alleged by the plaintiff involves her immediate supervisor, Frank Eisermann. Ms. Flockhart alleges that she was the victim of verbal abuse and unequal pay. IBP concedes that Mr. Eisermann could be a difficult person to work with, however, it is IBP's position that Mr. Eisermann did not treat Ms. Flockhart any differently than he did his male subordinates. The Court concludes, based upon all the evidence, that Mr. Eisermann did treat Ms. Flockhart differently and that this differential treatment was based upon her gender.

In terms of Mr. Eisermann's treatment of the plaintiff, her complaints basically revolve around Mr Eisermann screaming at her, using profanity towards her, throwing things at her, assigning more duties to her, following her around—including during bathroom breaks, and making general comments about the relative roles of males and females in the workplace.

The evidence is extensive that Mr. Eisermann would frequently refer to the plaintiff as a "dumb bitch." He would yell at her across the supply room calling her a "dumb bitch" or "stupid bitch". Witnesses such as John Wilson testified that he frequently and regularly heard Mr. Eisermann make comments of this kind in talking to the plaintiff. Other witnesses corroborated that Mr. Eisermann would frequently scream across the room at Ms. Flockhart and regularly use extremely derogatory comments to her in the workplace.

Leroy Wood was a truck driver who regularly made deliveries to IBP. One of Ms. Flockhart's duties was to check-in the deliveries as they were made to the supply department. Mr. Wood testified that Ms. Flockhart was an extremely helpful and

courteous employee. On at least a couple of occasions, he was personally present when Mr. Eisermann came out onto the loading dock, cursed at the plaintiff, called her a "dumb bitch," and told her to get back inside.

The evidence also shows that the plaintiff was often assigned duties that Mr. Eisermann considered "women's work." In particular, any typing that needed to be done was assigned to her, as well as any clean-up duties. He would make comments to Ms. Flockhart that the men did a lot more work than women did in the workplace. Ms. Macheak, who worked closely with Mr. Eisermann, felt very strongly that Mr. Eisermann treated Ms. Flockhart differently than the male employees.

Another example of Mr. Eisermann's attitude toward Ms. Flockhart is an incident involving Ms. Flockhart's telephone. As a supply clerk, she had the need to frequently make phone calls to vendors and other departments within the IBP plant. She had a telephone at her desk for that use. Mr. Eisermann claims that Ms. Flockhart was making excessive personal phone calls. As a consequence, he disconnected her phone. A manager clearly has the right to disconnect a telephone if he believes an employee is making excessive personal phone calls and abusing the privilege of having a phone at her desk. However, in Ms. Flockhart's case, Mr. Eisermann did not tell Ms. Flockhart that he had disconnected the phone, but rather allowed her to believe that the phone was malfunctioning. Consequently, Ms. Flockhart made many efforts to have the phone fixed before it was ultimately revealed to her that Mr. Eisermann had disconnected the

phone. If Mr. Eisermann truly disconnected the phone because of his concern that Ms. Flockhart was making too many personal phone calls, then why didn't he tell Ms. Flockhart the real reason? In addition, the disconnecting of the phone had the effect of making it more difficult for Ms. Flockhart to perform her duties. While it is not the province of this Court to second guess a management decision, it certainly is curious that Mr. Eisermann would not have selected some other method of discipline other than one that made it much more difficult for Ms. Flockhart to effectively perform her responsibilities. The phone was never turned back on before she left her employment at IBP. The Court believes that this is a further indication of Mr. Eisermann's attitude towards female employees.

The fact that Mr. Eisermann treated the plaintiff differently, used gender specific terms such as "dumb bitch" to refer to the plaintiff, and made gender-based derogatory comments, all lead to the conclusion that Ms. Flockhart was treated differently and much more severely by Mr. Eisermann. This was further corroborated by the fact that Mr. Eisermann made comments such as "don't piss off the guys" when Ms. Flockhart made a suggestion for a change in procedure shortly before she left her employment at IBP.

The Court's conclusion that Mr. Eisermann treated Ms. Flockhart differently than male employees is reinforced by the unequal pay issue in this case. Ms. Flockhart testified, as was corroborated by Mr. Schwenneker, that she complained frequently to Mr. Schwenneker about the fact that she was being paid less than her male counterparts.[2]

**2.** This issue also underlies a separate claim in this lawsuit based upon an alleged violation of the Equal Pay Act. While the Court has ultimately determined that the plaintiff has failed to carry her burden of proof on her equal pay

claim, Ms. Flockhart's evidence on the issue raises serious concerns which, when viewed in the context of all the evidence, lends further support to the Court's conclusion that

IBP asserts that the pay rate for management support personnel is set by the plant manager, not department supervisor, and, therefore, any pay issues cannot be used to show bias by Frank Eisermann. However, the testimony of Mr. Schmitz, the plant manager, indicated that the primary factor in his decision as to management support personnel pay was the supervisor's job evaluations. In this case, the supervisor who would do those evaluations and make recommendations to Mr. Schmitz was the engineering manager, Mark Schwenneker. Mr. Schwenneker testified that he made his recommendation to Mr. Schmitz as to the supply department personnel based exclusively on the recommendations he received from Mr. Eisermann. In fact, Mr. Schwenneker testified that he always accepted Frank Eisermann's recommendations on pay raises. While it is true that the ultimate decision making responsibility for pay increases rests with the plant manager, as a practical matter the recommendation by the departmental head, in this case, Frank Eisermann, is the key factor in setting those raises.

As previously discussed, management support personnel are paid within certain wage categories. A supply clerk, which was Ms. Flockhart's job title from the time she started at IBP until her promotion to senior supply clerk on October 24, 1994, is paid at the "DD" pay rate. Senior supply clerks are paid at the "BB" rate. The evidence shows that once she had been promoted into the "BB" pay class, Ms. Flockhart was consistently paid below the minimum rate for her job classification. For example, when she was promoted in 1994, the bottom rate for a "BB" employee was $8.30 per hour but plaintiff was paid

only $8.20 per hour. She received a raise in February 1995, to $8.50 per hour. However, the minimum rate for "BB" employees went up at the same time to $8.72 per hour.[3] The evidence also shows that none of the male senior supply clerks were ever paid below the prescribed minimum rate. The only other senior supply clerk who had ever been paid less than the minimum "BB" rate was Ms. Flockhart's female predecessor, Lucinda Gleason.

IBP attempts to respond to this testimony by arguing that the pay rate scale is only a guideline. It is IBP's position that plant managers are not bound to pay within the guidelines. However, Rich Jochum, Assistant Vice-president for IBP's legal division, gave very interesting testimony in this regard. He testified under direct examination that the corporate home office sets the wage scales for management support personnel, that the plant personnel manager assists in making certain that the rate structure is followed, and that there is very little discretion on how the rates are applied. He went on to state that the plant manager has the ultimate responsibility for setting wages, and testified: " . . . if he goes outside those guidelines I whack him back into shape." During the cross examination of Mr. Jochum, the Court took a morning recess. After the recess, the cross examination concluded, and then, on redirect examination, Mr. Jochum attempted to change his testimony about the binding effect of the pay structure. He testified that what he meant to say was that it was only binding at the top end, but that plant managers were free to pay less than the minimum of the pay scale for employees within a particular pay classification.

Mr. Eisermann treated female employees differently from male employees.

3. Shortly before leaving IBP, Ms. Flockhart's pay rate was increased to $8.80 per hour, which placed her marginally above the prescribed minimum of $8.72.

There is also evidence that tends to show that male employees, including employees that Ms. Flockhart "supervised," were paid more than she was. While the turnover within the supply department makes comparisons somewhat difficult, there are two male employees for whom relatively reliable comparisons are possible. Both Thomas Northey and Mark Peters have worked at IBP since on or around the time the Waterloo plant opened in 1990. They transferred into the supply department at some point prior to 1992. Both worked as "supply clerks" with Ms. Flockhart prior to her promotion, and both remained supply clerks after the plaintiff was promoted to "senior supply clerk" on October 24, 1994. As discussed, as a senior supply clerk, Ms. Flockhart was promoted into a higher pay grade, pay grade "BB" and ostensibly had additional duties and responsibilities. While she was not classified as a "supervisor" within the IBP hierarchy, she did have some supervisory responsibilities, including responsibilities when Mr. Eisermann was absent.

All three employees, that is, Ms. Flockhart, Mr. Northey and Mr. Peters, started at about the same wage in 1990, that is, around $6.00 per hour. They received fairly comparable pay increases through the end of 1993. However, starting in 1994, Mr. Northey and Mr. Peters began to receive more significant increases than Ms. Flockhart. This is particularly compelling given the fact that Ms. Flockhart had received a promotion and theoretically should have been receiving a higher wage as a senior supply clerk than as a supply clerk. IBP's own records show that on February 28, 1994, Ms. Flockhart and Mr. Northey were each being paid $8.20 per hour, while Mr. Peters was being paid $8.25 per hour. That pay structure continued even after Ms. Flockhart's promotion in October 1994. On February 27, 1995, Ms. Flockhart went to $8.50 per hour, while Mr. Northey and Mr. Peters were paid $8.55 per hour. On February 26, 1996, Mr. Northey went to $8.75 per hour, while Mr. Peters and Ms. Flockhart were each given raises to $8.80 per hour.

Ms. Burnielle Ott, EEO manager for IBP, testified that she felt there was no pay disparity between males and females. However, when asked why Mr. Peters, who had virtually identical performance evaluations as Ms. Flockhart, was being paid the same or more than Ms. Flockhart when plaintiff was a senior supply clerk and Mr. Peters was only a supply clerk, Ms. Ott's only explanation was that Ms. Flockhart had the benefit of regular hours on the day shift. IBP also suggests that differences in the individuals' work experience—e.g., Mr. Peters worked in a parts department at another company for 9 years prior to joining IBP—easily account for the minimal differences in wage at issue in this case.

For reasons which will be discussed later in the opinion, the Court concludes that the plaintiff has failed to carry her burden on the Equal Pay Act claim. That said, however, the evidence on the unequal treatment of females as it relates to pay in the supply department is far from insignificant—particularly in light of the key role that Mr. Eisermann played in the chain of command for setting wages and pay increases. Coupled with the other evidence regarding Mr. Eisermann's conduct toward the plaintiff, the Court concludes that the plaintiff was treated differently by Mr. Eisermann than her male counterparts.

### 4. JoDee Flockhart's Response and Notices to IBP

As has already been indicated, Ms. Flockhart made numerous complaints to management personnel at IBP concerning her treatment by Mr. Wisecup, Mr. Eisermann, and her co-employees. IBP's sexual harassment policy, which is posted

throughout the plant, provides that any complaints of discrimination may be made through a supervisor, to the plant Personnel Office, or by calling a toll free number which connects with the corporate EEO office at IBP Corporate Headquarters. Ms. Flockhart complied with the notice provisions by complaining to a number of different management personnel about her treatment. In addition, as already stated, there is ample testimony in the record that much of the conduct, particularly the harassing conduct towards female employees in general, was well known to management personnel and was done in the presence of, or by, IBP managers.

Specifically, in Ms. Flockhart's case, she complained to Mr. Eisermann, her immediate supervisor, about the Wisecup incidents. Mr. Eisermann relayed the Wisecup complaints to the plant engineer, Mr. Scwhenneker, and his predecessor, Mr. Truxel. Ms. Flockhart also complained about Mr. Eisermann and the co-employee conduct directly to Mr. Schwenneker and Tim Schelle, the maintenance superintendent. Both Mr. Schwenneker and Mr. Schelle confirmed that Ms. Flockhart did make frequent complaints, however, there is some dispute as to the exact frequency and of the substance of their conversations. That said, there is no dispute that she complained about the comments and conduct of co-employees towards her, Mr. Eisermann's abusive language, and her feeling that she was being paid less than her male counterparts.

During the last one to two years prior to leaving IBP, Ms. Flockhart had a number of meetings with Mr. Schwenneker. She considered Mr. Schwenneker somewhat of a confidant regarding her problems at IBP. Initially, she would meet with Mr. Schwenneker every two to three months. During the last several months prior to her leaving IBP, the frequency of those meetings increased to approximately once

a month. At those meetings, Ms. Flockhart would complain about the conduct of the co-employees towards her, Mr. Eisermann's extremely abusive language and conduct, and the pay issue. Generally, Mr. Schwenneker would try to be supportive, tell her to "hang in there" and say that he would talk to Mr. Eisermann about trying to make the work environment more tolerable. Beyond that, there was no investigation made about any of her complaints nor were any concrete steps taken to address her concerns.

Over the course of Ms. Flockhart's employment at IBP she became increasingly frustrated and emotionally distraught by the sexual harassment that she was subjected to. The emotional distress resulted from a combination of factors: the Wisecup incidents, the lack of any effective response to her complaints about Mr. Wisecup, the harassment and belittlement by Mr. Eisermann, the daily abuse and harassment by co-employees, the general working environment for females at the IBP plant, and IBP's failure to effectively respond to any of her complaints. Ms. Flockhart became angry, couldn't sleep and cried frequently. She also became depressed and was prescribed depression medication.

There is considerable testimony which supports Ms. Flockhart's testimony about the deterioration of her emotional state. Leroy Wood testified about the times he saw Ms. Flockhart with tears in her eyes and appearing extremely emotional. Scott Belden testified about occasions when he saw the plaintiff very emotionally upset concerning situations with co-employees and some of the comments that were being made to her.

The plaintiff's former partner, Meg Heatley, also corroborated the deterioration in the plaintiff's emotional well being. Ms. Heatley is a physician's assistant and

eventually prescribed depression medication for Ms. Flockhart. She testified that Ms. Flockhart would come home extremely distraught and upset about the way she was treated by Mr. Eisermann and her co-employees at IBP. Ms. Heatley also testified that the situation got worse after Ms. Flockhart's promotion in 1994. She and Ms. Flockhart had initially been excited about the promotion because they felt they could have a more normal life with Ms. Flockhart working a regular day shift. Prior to the promotion, Ms. Flockhart worked very erratic hours, including a number of night shifts. However, the situation actually got worse because Ms. Flockhart's transfer to the day shift meant that she had more daily contact with Mr. Eisermann. The increased contact and abuse by Mr. Eisermann exacerbated Ms. Flockhart's continuing emotional deterioration.

During the last six months of Ms. Flockhart's employment the situation got worse. Ms. Flockhart gained weight so she would appear less attractive to the male employees, and experienced physical problems, insomnia, depression, and anxiety. It was during this period that Ms. Heatley arranged to have medication prescribed for Ms. Flockhart that would address her anxiety and depression.

The harassment and deterioration of the plaintiff's mental condition culminated in the events of Friday, May 10, 1996. On that date, the plaintiff was late for work because there had been a power failure and her alarm clock had not gone off on time. When she arrived, she went back to her desk, and then saw Mr. Eisermann writing up what she thought to be a reprimand for tardiness. She became very upset about the reprimand for two reasons. First, it was common practice, as corroborated by testimony of other witnesses, for Mr. Eisermann to call employees who are late. Mr. Eisermann had not done that

for Ms. Flockhart. Secondly, it is Ms. Flockhart's understanding that a reprimand was not to be issued unless there were three tardy's within a year. This was Ms. Flockhart's first tardy in 1996. At that point, Ms. Flockhart told Mr. Eisermann what he could do with the job and indicated she was quitting. She left the supply area and went down to the Personnel Office.

At the Personnel Office, Ms. Flockhart met with Mr. Gordon and Mr. Schmitz. She told them about her complaints regarding Mr. Eisermann and indicated that she was quitting. Mr. Gordon asked that she not make a final decision until the following Monday. He indicated he would conduct an investigation and asked Ms. Flockhart to call him back on Monday. Mr. Gordon told Ms. Flockhart to go home and take the day off. Mr. Gordon testified it would have been a day without pay but Ms. Flockhart would not have been charged with an unexcused absence.

When Ms. Flockhart called on Monday, she was advised by Mr. Gordon that he had done an investigation and felt there was no merit to her claim that she was being paid less than the males. He did indicate that he was able to confirm that Mr. Eisermann used abusive language and suggested Ms. Flockhart transfer to another department within the plant. There is a dispute as to what exactly was offered to Ms. Flockhart. Ms. Flockhart testified that she was offered a production job at $2.00 per hour less in pay, which she found to be unacceptable. Mr. Gordon testified that there was no specific discussion about which position she would be transferred into or what she would be paid. The Court believes that Ms. Flockhart's version is closer to the truth. Referring to Ms. Kinsey Thompson's investigation of the incident, defendant's Exhibit "D", Ms. Kinsey Thompson advised the Iowa Civil

Rights Commission that Mr. Gordon had suggested Ms. Flockhart move to another position within the company in the "production area." It is unclear as to whether there was any specific discussion about pay; however, Ms. Flockhart was certainly justified in believing that a transfer to the production area would result in a loss of pay and benefits. In addition, it is well known that a production job is considerably less desirable at the IBP plant than a job in the supply area.

Ms. Flockhart declined the transfer and indicated that she did not desire to work at IBP any longer. Certainly, by that point her resignation from IBP became final. There is some evidence of a discussion a few days later between Ms. Kinsey Thompson and Mr. Schwenneker about Mr. Schwenneker approaching Ms. Flockhart to see if something could be worked out to have her come back to work at IBP. However, nothing was done to follow through on that suggestion.

### 5. *IBP's Response*

One of the most telling pieces of evidence in this case came from the testimony of Mark Gordon, IBP's personnel director in Waterloo. Mr. Gordon testified that when Ms. Flockhart came to his office on May 10, 1996, Mr. Schmitz, the plant manager, was standing outside the office. Ms. Flockhart advised Mr. Gordon and Mr. Schmitz about her complaints concerning Frank Eisermann, and the reasons she was quitting IBP. Mr. Gordon testified as follows concerning Mr. Schmitz's response:

Q. Did you have any further conversation with [Ms. Flockhart] that day?

A. Another piece of the conversation that I didn't bring up was Jim [Schmitz] had mentioned that Frank [Eisermann] had been a good manager and he was probably one of the best supply managers that he had experienced in his work history with IBP through the plants that he had been in and that he wasn't planning on doing anything as far as his employment or letting him go.

Q. He said that in front of Ms. Flockhart?

A. That's correct.

This Court believes that Mr. Gordon's testimony speaks volumes about IBP's attitude towards sexual harassment complaints and why Ms. Flockhart's prior complaints had never been adequately addressed. Here we have a situation where an emotionally distraught female employee advises the plant manager that she is quitting because she has been harassed and the victim of unequal pay. One of the first statements made by the plant manager, before any investigation has been conducted or any facts known, is that the alleged perpetrator is too valuable an employee to take any action against.

The consistent theme throughout the testimony in this case was that Mr. Eisermann was one of the most efficient supply managers in the IBP organization and nothing was going to be done to address his treatment towards female employees. In other words, if mistreatment of female employees was the price that had to be paid for corporate efficiency, then so be it.

Mr. Schmitz's attitude towards this investigation explains much of what happened over the months that followed Ms. Flockhart's resignation. IBP had the option at that point of either conducting a fair and thorough investigation, or stonewalling and presenting a defense to the Iowa Civil Rights Commission that was either knowingly false or, at best, grossly negligent in its recitation of the facts. IBP chose the latter. Even Burnielle Ott, IBP's current EEO coordinator, admits that the investigation in this case was flawed. Given IBP's treatment of Ms. Flockhart, this Court finds it difficult to

believe that the flaws in the investigation are the result of simple negligence.

In discussing IBP's response to Ms. Flockhart's complaint, this Court does not mean to imply that the respondent to a complaint, or ultimately a defendant in a lawsuit, does not have the right to aggressively advocate its position. However, there is a difference between "hard ball" litigation and "hide the ball." In addition, IBP's investigation of Ms. Flockhart's complaint, both before and after she left IBP, and its failure to maintain records, or their ultimate destruction, all go to the issue of whether IBP has a fair and effective discrimination policy.

IBP's position paper to the Iowa Civil Rights Commission is authored by Ms. Kinsey Thompson and contains a number of factual errors. For instance, she states that in Ms. Flockhart's calls and letters to IBP officials Ms. Flockhart asks for an investigation only, but that in Ms. Flockhart's complaints to Personnel Manager Gordon she asked that her supervisor, Frank Eisermann, be fired. Both Ms. Flockhart and Mr. Gordon agree that no such request was ever made by Ms. Flockhart and at no time did Ms. Flockhart request that Mr. Eisermann be fired. In fact, they agree that all Ms. Flockhart ever asked for was to have the harassment stopped.

Ms. Kinsey Thompson goes on to state that there were no other complaints to support Ms. Flockhart's allegations against Mr. Eisermann. While this may be technically true, it misstates the investigation that was conducted. While there may not have been other complaints, Mr. Gordon acknowledged in his testimony that his investigation showed there was evidence to support Ms. Flockhart's complaints about Mr. Eisermann's abusive conduct towards supply room employees.

Ms. Kinsey Thompson also states in the letter that Ms. Flockhart never made any allegations that anyone at IBP had ever touched her. This, of course, was blatantly false. By IBP's own admission, Ms. Flockhart had made at least one complaint against Mr. Wisecup. This complaint was sufficiently serious that it was reported all the way through Mr. Gordon to Mr. Schmitz. The Personnel Office at the Waterloo IBP plant which was involved in preparing IBP's response to Ms. Flockhart's complaint was certainly well aware of the Wisecup incident and was aware that she had made complaints of physical touching at the same time they were advising the Iowa Civil Rights Commission that no such complaints had ever been made.

The response also stated that the complainant [JoDee Flockhart] did not complain about sexual harassment to management while still employed at IBP. This is contrary to the testimony of Ms. Flockhart and Mr. Schwenneker. Mr. Schwenneker, who was interviewed extensively by Ms. Kinsey Thompson, acknowledged Ms. Flockhart had made a number of complaints concerning both her co-employees and Mr. Eisermann. Her notes of the May 14, 1996, interview with Mr. Schwenneker specifically state that Mr. Schwenneker had been advised that Mr. Eisermann swore at Ms. Flockhart and threw things at her. Mr. Schwenneker claims that Ms. Flockhart never used the words "sexual harassment;" however, it is clear from the context of all the comments, that Ms. Flockhart was complaining to Mr. Schwenneker about her treatment by Mr. Eisermann, the fact that she was treated more severely than male employees, her unequal pay, and the gender-based derogatory comments by co-employees.

Finally, Ms. Kinsey Thompson states: "A review of IBP files revealed no complaints of any kind lodged against Supervisor Eisermann in the five years he has been a supervisor with IBP." That state-

ment is clearly false because there were no files to review. IBP had no filing system by which complaints of discrimination were filed, cataloged, or in any way indexed. The statement is false because there would be no way to conduct such a file review.

In addition, IBP generally tried to make life difficult for Ms. Flockhart after she terminated her employment. She applied for unemployment compensation benefits and made several requests for her personnel file from IBP so that it could be used as part of the unemployment compensation hearing. Initially, IBP indicated they would give her the file but then refused to do so. Ultimately, one, and possibly two, subpoenas had to be issued by the Iowa Unemployment Compensation Board before the file was produced. Once produced, the file was incomplete.

Ms. Flockhart prepared her complaint for filing with the Iowa Civil Rights Commission on May 13, 1996, the Monday she had her final conversation with Mr. Gordon. In the complaint as initially filed, she did not mention the David Wisecup incidents. She only complained generally of being the victim of sexual harassment, and receiving less pay than her male counterparts. She later amended her complaint to include the allegations against Mr. Wisecup.

## II. CONCLUSIONS OF LAW

This Court ultimately concludes that the plaintiff has met her burden of proving violations of Title VII and the Iowa Civil Rights Act ("ICRA"), and is entitled to monetary damages as to those claims. In addition, the Court intends to set a hearing on the issue of what equitable relief, if any, should be entered in this case. As to the plaintiff's claim under the Equal Pay Act, although it is a very close question, the Court concludes that the plaintiff has failed to prove a violation under the Act.

As the undersigned indicated at the conclusion of the trial, the facts of this case reveal a sad and disturbing pattern of conduct by IBP employees and management. Not only was the plaintiff the victim of pervasive sexual harassment, it is clear that the harassment took place in a climate in which women were routinely the subject of sexual taunting, groping, and extremely demeaning conduct. More troubling is the fact that IBP seems to take the attitude that it is powerless to address the issues of sexual harassment and, when confronted with complaints made by persons such as Ms. Flockhart, any investigation was directed more towards disproving the claim, as opposed to a search for truth and implementation of effective remedial measures.

### A. Sexual Harassment and Constructive Discharge

■ The plaintiff has brought her sexual harassment claims under the Iowa Civil Rights Statute and Title VII. For purposes of analyzing the claims of liability, the standards under both statutes are the same. *See Madison v. IBP, Inc.*, 257 F.3d 780, 799 (8th Cir.2001); *Board of Supervisors of Buchanan County v. Iowa Civil Rights Comm'n*, 584 N.W.2d 252, 256 (Iowa 1998); *Hy–Vee Food Stores, Inc. v. Iowa Civil Rights Comm'n*, 453 N.W.2d 512, 516 (Iowa 1990). Once liability is established, there are differences as to types and measure of damages. *See, e.g., Madison*, 257 F.3d at 798–800 (discussing distinctions between damages under Title VII and the ICRA). Those differences will be discussed when the Court addresses the damage claims.

The plaintiff claims that she was sexually harassed by supervisors and non-supervisors and that the harassment and IBP's inadequate response resulted in her constructive discharge in May 1996. The sub-

stantive facts and elements underlying the sexual harassment and constructive discharge claims are integrally related: e.g., the plaintiff's claim of sexual harassment serves as the lynchpin of her constructive discharge claim while a showing of constructive discharge would establish an element of her sexual harassment claim and bar IBP's assertion of an affirmative defense to the sexual harassment claim. *See Jackson v. Arkansas Dept. of Ed.,* 272 F.3d 1020, 1026 (8th Cir.2001) (holding that a "constructive discharge would constitute a tangible employment action and prevent [the employer] from utilizing the affirmative defense" to vicarious employer liability for sexual harassment). For purposes of discussion, the Court will address the elements of the plaintiff's sexual harassment claim first and then turn to the additional showing necessary for a finding of constructive discharge.

To establish a claim for sexual harassment, the plaintiff must prove that "she was a member of a protected group, that she was subjected to unwelcome sexual harassment, that the harassment was based on sex, and that the harassment affected a term, condition, or privilege or her employment." *Beard v. Flying J., Inc.,* 266 F.3d 792, 797–98 (8th Cir.2001) (citing *Schoffstall v. Henderson,* 223 F.3d 818, 826 (8th Cir.2000)). "Harassment affects a term, condition, or privilege of employment if it is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an objectively hostile or abusive work environment.'" *Ogden v. Wax Works, Inc.,* 214 F.3d 999, 1006 n. 9 (8th Cir.2000) (quoting *Howard v. Burns Bros., Inc.,* 149 F.3d 835, 840 (8th Cir.1998)) (other citations omitted). Relevant factors for determining whether conduct rises to this level include its frequency; severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employ-

ee's work performance. *Id.* (citations omitted); *accord Kimzey v. Wal–Mart Stores, Inc.,* 107 F.3d 568, 572–73 (8th Cir.1997). Additionally, the plaintiff must demonstrate "a subjective belief that she is working in a hostile environment" in order to establish that the harassment "actually altered the conditions of [her] employment." *Kimzey,* 107 F.3d at 573 (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21–22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)).

■ The Court finds that the plaintiff has proven all the factors required to establish a claim of sexual harassment under Title VII and the Iowa Civil Rights Act. It is undisputed that the plaintiff's gender places her in a protected group for purposes of Title VII and it is the Court's conclusion that the plaintiff has proven she was the victim of unwelcome sexual harassment, that the harassment was based on sex, and that the harassment affected a term, condition or privilege of her employment. *See, e.g., Beard,* 266 F.3d at 797–98 (listing elements). As set out in the Court's factual findings, the harassment to which Ms. Flockhart was subjected included sexual touching and groping by Mr. Wisecup, discriminatory sexual conduct by Mr. Eisermann, and abusive sexual language by co-employees.

■ One of the defenses set forth by IBP is that the conduct was not unwelcome. In support of this argument, IBP points to instances in the record where employees had testified that Ms. Flockhart, on occasion, used coarse language when some of the co-employees were taunting her. *See Beard,* 266 F.3d at 798 ("A plaintiff must indicate by her conduct that the harassment was unwelcome, and evidence that she 'engaged in behavior similar to that which she claimed was unwelcome or offensive' is evidence that the behavior is not unwelcome.") (quoting

*Scusa v. Nestle U.S.A. Co.*, 181 F.3d 958, 966 (8th Cir.1999)). There is conflicting evidence about how often such incidents occurred. While there is considerable evidence that on many occasions Ms. Flockhart just turned around and left the situation, there is also evidence that on other occasions she responded with obscene language. In the context of the entire case, however, the Court does not believe that those responses are fatal to the plaintiff's case. The record is replete with evidence that Ms. Flockhart frequently complained to Mr. Schwenneker and other employees about the abusive language and conduct, and that she suffered obvious emotional distress from these encounters. The fact that she may have responded in kind on a few occasions does not demonstrate that the conduct was not unwelcome. *See Beard*, 266 F.3d at 798 ("Evidence that [the plaintiff] spoke in sexually suggestive terms, moreover, hardly proves as a matter of law that she would welcome having her breasts touched, particularly in light of the fact that there was evidence that she specifically objected to [her supervisor's] conduct. The jury was thus free to conclude that the sexual attention was unwelcome.").

■ Ms. Flockhart has also amply demonstrated that the unwelcome harassment was based on her gender. Clearly, Mr. Wisecup's groping incidents were based upon the plaintiff's gender. Likewise, as this Court has indicated, Mr. Eisermann treated the plaintiff differently and the Court finds that his frequent references to her as a "stupid bitch" constitute clear evidence of conduct based on the plaintiff's gender—particularly in light of Mr. Eisermann's presence and/or awareness of the comments and conduct of the plaintiff's co-employees, which were arguably more gender-specific and extreme. Those included frequent references to Ms. Flockhart as, among other things, a "slut," "whore," "bitch," and a "cunt," and requests on more than one occasion to touch her breasts.

■ Finally, the Court finds that Ms. Flockhart has easily demonstrated that the harassment affected a term, condition, or privilege of her employment; i.e., it was "severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive." *Harris*, 510 U.S. at 21, 114 S.Ct. 367. In this respect, the facts of this case are not unlike those in *Kimzey v. Wal–Mart*, where a plaintiff's verdict was affirmed. 107 F.3d at 573–74 (listing facts relevant to hostile environment finding). The abusive language and behavior complained of by Ms. Flockhart began shortly after she started work and IBP management either knew about or participated in the harassment throughout her employment at IBP. *See id.* at 574. The frequency of Ms. Flockhart's complaints to IBP management, via her conferences with Mr. Schwenneker, increased as she neared the date of her termination. *See id.* And finally, the management at IBP generally ignored the complaints and took no effective action. *See id.*

Testimony by other employees, most notably Sara Hermann, Ann Macheak and Bob Wilson, further attests to the pervasive nature of the environment faced by the plaintiff—both as to Frank Eisermann's abusive and derogatory treatment of the plaintiff in comparison with male employees and as to the ongoing comments and conduct directed at the plaintiff and female employees in general. *See Madison*, 257 F.3d at 793–94 (admitting evidence of racial and sexual discrimination against other employees as relevant to hostile work environment inquiry: "To determine whether a hostile work environment existed, evidence concerning 'all circumstances' of the complainant's employ-

ment must be considered. [E]vidence of a hostile environment must not be compartmentalized, but must instead be based on the totality of the circumstances of the entire hostile work environment.'" (internal citations and quotations omitted)). And, finally, the plaintiff's testimony, as well as that of Ms. Heatley and co-employees, regarding the plaintiff's obvious agitation and emotional deterioration as the abusive conduct and lack of effective response continued established her subjective belief that she worked in a hostile environment that "altered the conditions of her employment." *See id.*

In sum, the evidence shows that the plaintiff was a victim of near continuous sexual abuse and harassment during her entire tenure of employ. *See id.* (finding relevant that abusive behavior began shortly after the plaintiff started working and continued throughout her employ). No reasonable person could possibly find that a work environment which involved being called a "stupid bitch" by her immediate supervisor on a daily basis, being called a "cunt, slut, whore and bitch" by her co-employees on a daily basis, and physical assault and groping by a male co-employee was not a hostile or abusive environment. *See id.* at 573–74 ("A workplace permeated with 'discriminatory intimidation, ridicule and insult' is sufficiently severe to establish a hostile work environment.") (quoting *Harris*, 510 U.S. at 21, 114 S.Ct. 367). Thus, as in *Kimzey*, the evidence in this case, detailed in the Court's factual findings, demonstrates "more than a few isolated incidents of harassment and is sufficient to establish a hostile work environment." *Kimzey*, 107 F.3d at 574 (citing *Hall v. Gus Constr. Co.*, 842 F.2d 1010 (8th Cir.1988)).

■ The plaintiff's constructive discharge claim is equally meritorious. The elements of constructive discharge were most recently set out by the Eighth Cir-

cuit in *Jackson v. Arkansas Dept. of Ed.*, 272 F.3d 1020, issued on December 4, 2001:

"Constructive discharge occurs 'when an employer deliberately renders the employee's working conditions intolerable and thus forces [her] to quit [her] job.'" *Phillips [v. Taco Bell Corp.*, 156 F.3d 884, 890 (8th Cir.1998) ] (quoting *Johnson v. Bunny Bread Co.*, 646 F.2d 1250, 1256 (8th Cir.1981)). To be liable, the employer must have intended to force the employee to quit, or at least have reasonably foreseen the employee's resignation as a consequence of the unlawful working conditions it created. *See id.; see also Tidwell v. Meyer's Bakeries, Inc.*, 93 F.3d 490, 494 (8th Cir.1996) ("To constitute a constructive discharge, the employer must deliberately create intolerable working conditions with the intention of forcing the employee to quit and the employee must quit."). Furthermore, the employee must also show that a reasonable person, from an objective viewpoint, would find the working conditions intolerable. *See Phillips*, 156 F.3d at 890; *Allen v. Bridgestone/Firestone, Inc.*, 81 F.3d 793, 796 (8th Cir. 1996). To be reasonable, an employee must give her employer a reasonable opportunity to correct the problem. *See Phillips*, 156 F.3d at 890.

*Jackson*, 272 F.3d 1020, 1026–27; *accord Sowell v. Alumina Ceramics, Inc.*, 251 F.3d 678, 685 (8th Cir.2001) ("A successful [constructive discharge] claim requires more than simply showing that an employer's actions have violated Title VII.... The employee's decision to resign must be reasonable in light of the circumstances; we have stressed that '[t]o act reasonably, an employee has an obligation not to assume the worst and not to jump to conclusions too quickly.'") (internal citations and quotations omitted). "In addition, ... if an employee quits because she reasonably

believes there is no chance for fair treatment, there has been a constructive discharge." *Ogden,* 214 F.3d at 1008 (citing *Kimzey,* 107 F.3d at 574).

Again, *Kimzey v. Wal–Mart* is instructive—particularly with regard to the ongoing nature of the harassment and the failure of IBP management to make any concerted efforts to address the plaintiff's concerns. *See Kimzey,* 107 F.3d at 574. In this respect, the Court finds IBP's failure to take any action concerning the Wisecup incidents particularly egregious. The incident in November 1995 was the third occurrence that Ms. Flockhart recalled and the third time she had complained about Mr. Wisecup's conduct to IBP management. Even after an investigation in which Mr. Wisecup admitted his involvement, no action was taken. This factor, together with the seeming inability of IBP to do anything about Mr. Eisermann's conduct, certainly created a hostile environment which was so severe and pervasive that Ms. Flockhart was justified in quitting her employment. Incorporating the Court's prior discussion of the plaintiff's sexual harassment showing, the Court now concludes that the plaintiff has clearly proven that the conduct and hostile environment in which she worked was such that a reasonable person would objectively find the working conditions intolerable. The Court also concludes that after several complaints to Mr. Eisermann about Mr. Wisecup and repeated complaints to Mr. Schwenneker about Mr. Eisermann and the co-employee conduct, Ms. Flockhart was justified in believing that IBP would take no effective remedial action. *See Phillips,* 156 F.3d at 890; *Kimzey,* 107 F.3d at 573–74 (affirming constructive discharge verdict where "[a] reasonable jury could find that the continuing harassment and management's indifference rendered [the plaintiff's] working conditions intolerable and forced her to quit").

B. *Equal Pay Act*

Section 206(d)(1), United States Code, Title 29, prohibits an employer from discriminating

> between employees on the basis of sex by paying wages to employees ... at a rate less than the rate at which he pays wages to employees of the opposite sex ... for equal work on jobs the performance of which requires equal skill, effort and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to ... (iv) a differential based on any other factor other than sex
> ....

29 U.S.C. § 206(d)(1). *See also Sowell,* 251 F.3d at 683 ("A successful gender-based wage discrimination claim ... requires the plaintiff to prove that her employer pays different wages to employees of opposite sexes 'for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.'") (quoting *Corning Glass Works v. Brennan,* 417 U.S. 188, 195, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974) (concerning the Equal Pay Act), and citing *EEOC v. Delight Wholesale Co.,* 973 F.2d 664, 669 (8th Cir.1992) (holding that same standard applies to Equal Pay Act and Title VII wage discrimination claims)). "The consideration of equal pay standards is based on actual job requirements and performance, not on job classifications or titles." *Peltier v. City of Fargo,* 533 F.2d 374, 377 (8th Cir.1976) (citation omitted). "The Equal Pay Act does not require that the jobs being compared be performed simultaneously but encompasses situations where an employee of one sex is hired for a particular job to replace an employee of the opposite sex." *Id.* (citing 29 C.F.R. § 800.114).

■ "The plaintiff has the burden of proving that the jobs involve 'equal work.'" *Krenik v. County of Le Sueur,* 47 F.3d 953, 960 (8th Cir.1995) (citation omitted). "For work to be 'equal,' it is not necessary that the jobs be identical, but only that they be substantially equal." *Usery v. Richman,* 558 F.2d 1318, 1320 (8th Cir.1977) (citation omitted); *see also* 29 C.F.R. § 1620.14 ("Insubstantial or minor differences in the degree or amount of skill or effort, or responsibility required for the performance of jobs will not render the equal pay standard inapplicable."). "Once the plaintiff has proven her prima facie case, the employer then bears the burden of coming forward with a legitimate nondiscriminatory factor upon which it based the wages paid." *Sowell,* 251 F.3d at 683 (citing 29 U.S.C. § 206(d)(1) (1994), and *Hutchins v. Int'l Broth. of Teamsters,* 177 F.3d 1076, 1080–81 (8th Cir.1999)).

The Equal Pay Act identifies considerations to be explored in determining whether otherwise similar jobs require equal work: skill, effort, responsibility and working conditions. *Usery v. Richman,* 558 F.2d 1318, 1320 (8th Cir.1977). "Skill includes such considerations as experience, training, education, and ability. Effort refers to the physical or mental exertion necessary to the performance of a job. Responsibility concerns the degree of accountability required in performing a job." *Berg v. Norand Corp.,* 169 F.3d 1140, 1146 (8th Cir.1999) (quoting *McLaughlin v. Esselte Pendaflex Corp.,* 50 F.3d 507, 513 (8th Cir.1995)). "[I]t is the overall job and not its individual segments which must form the basis of comparison." *Usery,* 558 F.2d at 1321 (finding no Equal Pay Act violation where from the totality of the facts presented, a male fry cook had more responsibility and performed more duties than female fry cooks).

At trial, the plaintiff attempted to prove gender-based unequal pay when compared with contemporaneously-employed male supply clerks and when compared with preceding and succeeding male senior supply clerks. Although it is a very close question, for the reasons discussed below the Court concludes that the plaintiff has failed to establish an Equal Pay Act violation under either theory.

1. Comparison with other "supply clerks:"

■ The Court first addresses the relevance of Noreen Bradfield, a female supply clerk who made more than both the plaintiff and male supply clerks during at least part of the relevant time period. IBP contends that Ms. Bradfield's position and wage history refute any prima facie showing of an equal pay violation. The plaintiff insists that Noreen Bradfield is not an appropriate comparator under the Act as her duties were essentially secretarial and did not involve the same skill or effort as the plaintiff's even though both held the same title for much of the plaintiff's tenure. The plaintiff is correct that the case law and regulations make clear that title alone is not indicative of whether two jobs require equal work. *See* 29 C.F.R. § 1620.13(e) (1998) ("Application of the equal pay standard is not dependent on job classifications or titles but depends rather on actual job requirements and performance."); 29 C.F.R. § 1620.13 ("Job titles are frequently of such a general nature as to provide very little guidance in determining the application of the equal pay standard. For example, the job title 'clerk' may be applied to employees who perform a variety of duties so dissimilar as to place many of them beyond the scope of comparison under the Act.... In all such situations, the application of the equal pay standard will have to be determined by applying the terms of the Act to the specific facts involved."). *See also EEOC v. Universal Underwriters Ins. Co.,* 653 F.2d

1243, 1245 (8th Cir.1981) ("[A] court must compare the jobs in question in light of the full factual situation ...."). The Court is inclined to agree that the nature of the plaintiff's and Bradfield's jobs are sufficiently dissimilar as to make comparison between the two inappropriate for purposes of the Act.[4]

■ Even excluding Bradfield, however, the Court is left with insufficient proof that the plaintiff was paid less than her male counterparts for equal work or that any marginal differences were not based on factors other than gender. Assuming that the appropriate comparator class based on the nature of the supply clerk duties consists of Thomas Northey and Mark Peters,[5] the evidence shows that, for an approximately two-year period, a five-cent discrepancy existed between the wages paid the plaintiff and those paid her male counterparts.[6] The Court was not particularly impressed by IBP's proffered explanations for the difference—e.g., Peters worked the night shift and/or had more experience prior to coming to IBP. However, given the extremely small comparator class and the marginal difference

at issue, the Court is not persuaded that the plaintiff can or has proven that this differential is based on gender. IBP's pay structure clearly contemplates some pay variation and flexibility within job classifications and/or among employees ostensibly doing equal work. Such a scheme, and the resulting wage differences, reflects myriad variables which could reasonably go into initial pay determinations as well as subsequent increase determinations. To find that the circumstances before the Court—a five-cent differential by two male employees over a period of two years—violates the Equal Protection Act would circumscribe employer personnel decisions beyond that contemplated by the Act. *See Brousard–Norcross v. Augustana College Association,* 935 F.2d 974 (8th Cir.1991) (affirming district court ruling that there was not a substantial difference between the plaintiff's pay and that of her male assistant professor peers sufficient to establish a submissible case: "Where the plaintiff's salary is marginally smaller than one comparator and marginally larger than another comparator, in a setting such as this where legitimate factors upon which to

---

4. This conclusion is qualified, however, by the observation that to so conclude is somewhat inconsistent with other evidence offered by the plaintiff in support of her wage claim. Much of the plaintiff's wage differential showing relies on mathematical comparisons of individual supply clerk wages against "standard" IBP job and maximum wage classifications. Within such an impersonal scheme, it would seem that the specific nature of a "supply clerk's" or "senior supply clerk's" duties are less relevant than the title and concordant classification. In other words, if the wage rate authorized by IBP for all "supply clerks"—regardless of the nature of their duties—falls between X and X+5, for example, then perhaps it is appropriate to take a more macro approach to the comparison by including all supply clerks within the pool.

5. Northey's and Peters' job titles were that of "supply clerk" during the relevant period

while the plaintiff was, nominally, a "senior supply clerk." The evidence supports a finding that, aside from some minimal and infrequent additional responsibilities, their duties were substantially similar and they performed equal pay for purposes of analysis under the Equal Pay Act. Thus, in this portion of the discussion and consistent with the Act's regulatory directives, the court will disregard "titles" and assume that Northey and Peters are appropriate comparators. Following this discussion, the court will address the plaintiff's assertion that she was paid less than other senior supply clerks who performed equal work.

6. In 1994, Peters earned $8.25 per hour while Flockhart earned $8.20 per hour. In 1995, Peters and Northey each earned $8.55 per hour while Flockhart received $8.50 per hour.

base salary differentials (e.g., scholarly work and teaching performance) can result in finely calibrated evaluations, a submissible Equal Pay Act claim has not been established."). *Cf. Peltier,* 533 F.2d 374 (finding *50% discrepancy* in salary between that received by male car markers and that received by female car markers violated the Equal Pay Act where extra duties performed by male employees consumed minimum amount of time and were essentially incidental to their car-marking duties).

### 2. Comparison with other "senior supply clerks:"

■ The plaintiff also argues that male senior supply clerks were paid more than females for equal work in violation of the Act. As noted above, the Court concludes that the plaintiff has failed to carry her burden of proof as to this claim. During the plaintiff's tenure at IBP, three persons were named as successive "senior supply clerks:" Chris Blumenstein, a male, from October 1991 to March 1992; Cindy Gleason, a female, from June 1992 to February 1994; and the plaintiff, from October 1994 to May 1996. The plaintiff's immediate nominal successor was Noreen Bradfield, who held the senior supply clerk position from September 1996 to March 1999. Finally, in April 1999, Mark Peters was promoted to the senior supply clerk position. The Court finds that the plaintiff has failed to prove that the marginal differences in wages paid to senior supply clerks over the period from 1991 through 1996 can establish an Equal Pay Act violation or that any such differences were gender-based. Each successive senior supply clerk, from 1991 through the plaintiff's departure started at a rate lower than the ending rate of his or her predecessor but ended up at a rate higher than his or her predecessor's highest rate. Further, each received comparable raises during his or her tenure: over a six month period, Blumen-stein's hourly wage increased by 20 cents; over a nineteen month period, Gleason's wage increased by 55 cents (in two steps); and over an 18 month period, the plaintiff's wage increased by 60 cents. Looking at these individuals' wages as a percentage of the maximum wage available under IBP's classification system proves equally inconclusive. All paid wages ranged between 62.1 and 66.4% of the classification maximum—a relatively small variation. In sum, the Court is not persuaded that this evidence demonstrates the plaintiff's argument—that male senior supply clerks earn more than their female counterparts for equal work. Finally, with regard to Peters' $12 salary in 1999, although comparison with non-immediate successors will under some circumstances be appropriate, *see Broadus v. O.K. Indus., Inc.,* 226 F.3d 937, 941–42 (8th Cir.2000), the Court concludes that under the facts of this case the three year gap between the plaintiff's departure and Peters' promotion to senior supply clerk makes any such comparison inconclusive and inappropriate. While Peters' wage is significantly higher than that paid to the plaintiff in 1996, the evidence shows that IBP's "standard" minimum and maximum wage for that job classification also rose significantly during that same period—evidencing that economic factors other than sex likely accounted for the wage difference between Peters and the plaintiff. *See Sowell,* 251 F.3d at 684 (affirming employer grant of summary judgment and noting employer's legitimate nondiscriminatory explanation that, in some instances, it had to pay higher wages to newly hired tool makers because of job market demands).

### C. *Damages*

#### 1. Back pay and front pay

■ Based upon the plaintiff's constructive discharge, Ms. Flockhart is entitled to back pay under both Title VII and

the ICRA to the date of judgment. *Excel Corp. v. Bosley,* 165 F.3d 635, 638 (8th Cir.1999); *Landals v. George A. Rolfes Co.,* 454 N.W.2d 891, 894 (Iowa 1990). The plaintiff was making $8.80 per hour on the date of her termination on May 10, 1996. For purposes of the back pay computation, the Court will assume and finds that based upon the evidence Ms. Flockhart would receive an average annual increase in her per hour rate of 6%. Based upon IBP's past history, those increases became effective as of the end of February of each calendar year. The Court will also award a 25% increase in the hourly wages to reflect fringe benefits and bonuses that may have been paid to Ms. Flockhart. As a management support person, Ms. Flockhart was entitled to participate in IBP's 401(k) Plan and receive bonuses and other fringe benefits. The Court finds that a 25% figure is a very conservative estimate of the value of those benefits to her. The Court will then deduct from total gross wage loss the total amount of earnings received from other employment since Ms. Flockhart's constructive discharge.

IBP claims that Ms. Flockhart has failed to mitigate damages in this case. *See Excel Corp.* 165 F.3d at 639 ("A Title VII claimant seeking either back pay or front pay damages has a duty to mitigate those damages by exercising reasonable diligence to locate other employment ..."). The Court finds that IBP has failed to prove that defense. *See id.* (holding that the "burden of proving that the employee did not make reasonable efforts is on the defendant"). Ms. Flockhart suffered severe emotional distress immediately following her constructive discharge from IBP. Despite that emotional distress, she did seek employment although she was unsuccessful for some period of time. Fortunately for IBP, Ms. Flockhart ulti-

mately was able to find a very good job with Deere & Company. In fact, the Court finds as a factual matter that as of the end of year 2000, Ms. Flockhart's wages and fringe benefits at Deere & Company are at least equal to, or possibly greater than, the pay and benefits she would have received at IBP. Consequently, the Court is making no award of back pay beyond December 31, 2000. In addition, because Ms. Flockhart has replaced her job at IBP with a comparable or better position at Deere & Company, no award of front pay will be made.

a. *May 10, 1996 to February 28, 1997.*

Turning to the actual computations themselves, the Court finds that between May 10, 1996, and February 28, 1997, there were 42 work weeks at 40 hours per week for a total of 1,680 work hours at $8.80 per hour. The total loss of wages for that period was $14,784.

b. *February 28, 1997 to February 28, 1998.*

Using a 6% increase in Ms. Flockhart's hourly rate results in an increase to $9.32 per hour. Based upon 52 weeks of work, 40 hours per week totals 2,080 work hours. The total loss of wages at $9.32 per hour is $19,386.

c. *February 28, 1998 to February 28, 1999.*

A 6% increase from the $9.32 per hour rate results in a new hourly rate of $9.88 per hour. Assuming a 2,080 hour work year results in a total wage loss of $20,550.

d. *February 28, 1999 to February 25, 2000.*[7]

Again, using a 6% increase in the hourly rate results in a new hourly rate

---

7. By this time, Mr. Peters, a non-immediate successor senior supply clerk, was earning

$12.00 per hour. Consequently, the Court

of $10.47 per hour. Fifty-two work weeks at 40 hours per week results in a total wage loss during that period of $21,778.

e. *February 25, 2000 to December 31, 2000.*

Ms. Flockhart's hourly rate at a 6% increase would result in a new hourly wage rate at IBP of $11.10 per hour on February 25, 2000. There are 44 weeks between February 25, 2000, and the end of calendar year 2000. At 40 hours per week, this results in a total wage loss of $19,536.

In summary, the plaintiff's loss in total wages between May 10, 1996, and December 31, 2000, equals $96,034. Adding 25% for lost bonuses, overtime, 401(k) Plan, and fringe benefits, results in a total wage loss of $120,043.

The plaintiff has presented, as part of the evidence in this case, a back pay calculation spread sheet. While the Court has not used the numbers for purposes of determining the gross wage loss in this case, the Court will use the plaintiff's figures to determine the amount of wages earned through other employment for purposes of mitigation. That figure through December 31, 2000, totals $82,192. This results in a net wage loss of $37,851.

The plaintiff has also included in her back pay computation sheet a request for interest on the lost back pay. Interest is not included in the back pay award in order to avoid duplication of damages. The Court is awarding pre-judgment interest on the entire award of back pay and emotional distress damages, so no interest is factored into the initial determination of the back pay award.

feels it is being quite conservative in the

2. Emotional distress damages

██ "An award of damages for emotional distress must be supported by competent evidence of 'genuine injury.' " *Forshee v. Waterloo Indus., Inc.,* 178 F.3d 527, 531 (8th Cir.1999) (quoting *Carey v. Piphus,* 435 U.S. 247, 264 n. 20, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978)). Before discussing the Court's conclusion that the plaintiff has proven entitlement to emotional distress damages, the Court will first address the parties' ardently-debated dispute as to the time period for which the plaintiff could legally recover such damages.

██ Essentially, IBP argued that any claim for emotional distress damages was limited under Title VII to the period from and after a date 300 days prior to the filing of Ms. Flockhart's claim with the Iowa Civil Rights Commission. It was that contention that formed one of the grounds for the dispute over the date of the last Wisecup incident. If the incident occurred in 1994, then it would have been outside the 300 day window and, under IBP's theory, no emotional distress damage could be awarded for any of the Wisecup incidents. On the other hand, if the incident did occur in late 1995, as this Court has found, then the complaint would have been timely filed and would have allowed for recovery of emotional distress damages.

██ The plaintiff countered by arguing that even if emotional distress damages are limited to the 300 day period under Title VII, they are recoverable under the Iowa Civil Rights Act for the entire period of any harassment suffered by the plaintiff. Since the trial of this case, that issue has been essentially resolved by *Madison v. IBP, Inc.,* 257 F.3d 780 (8th Cir.2001), and *Channon v. United Parcel Service, Inc.,* 629 N.W.2d 835 (Iowa 2001). Those

award of back pay.

cases, which were decided within two weeks of each other, make it clear that under Title VII the plaintiff is limited to 300 days of emotional distress damages. However, under the Iowa Civil Rights Statute, the plaintiff is entitled to an award of damages for the entire period that the plaintiff's rights were violated. Where, as here there is a continuing violation, the plaintiff may recover emotional distress damages for the entire period of time she was the subject of harassment. *Madison*, 257 F.3d at 800. In addition, the $300,000 cap for emotional distress damages under Title VII does not apply to the Iowa Civil Rights Act. *Channon*, 629 N.W.2d at 850.

 The Court has previously catalogued the harassment the plaintiff suffered during her entire term of employment at IBP, as well as the severe emotional distress that she suffered as a result. In summary, the evidence, as presented in testimony by Ms. Flockhart and others, clearly shows that Ms. Flockhart was suffering from extreme anxiety and depression leading up to the date of her termination. She was eventually prescribed a prescription anti-depressant and anti-anxiety medication to address those problems. Ms. Flockhart also suffered serious emotional distress as a result of her constructive discharge. This emotional distress impaired her ability to immediately seek and obtain alternate employment. In addition, the Court finds credible Ms. Flockhart's belief that she has repressed many of the incidents at IBP and that this loss of memory has contributed to her anxiety and distress over the harassment she suffered there.

There was also testimony from both Ms. Flockhart and her former partner, Meg Heatley, that the deterioration of the plaintiff's emotional state, both before and after she left IBP, contributed to the break-up of their relationship. Ms. Heatley and Ms. Flockhart both felt they were in a very committed relationship and intended that relationship be permanent. However, Ms. Flockhart's depression, anxiety and other emotional reactions to the situation at IBP and her eventual constructive discharge led to a deterioration of her relationship with Ms. Heatley and their eventual break-up.

Ms. Flockhart has seen a counselor on and off since the date of her constructive discharge. She continues to feel anxiety, resentment and anger towards IBP over the way she was treated. All these factors support the award of a substantial amount of emotional distress damages in this case.

The Court will temper the award, somewhat, due to the fact there also appear to be other factors in Ms. Flockhart's life which contributed to her emotional distress. While the Court has no doubt that the problems at IBP were a significant contributing factor in the break-up of her relationship with Ms. Heatley, it appears there were other factors and other issues the couple were dealing with. Many of the clinical notes from the counselor who treated Ms. Flockhart indicate that the center of her concerns revolved around her relationship with Ms. Heatley.

In making the award of emotional distress damages, the award is made under the Iowa Civil Rights Act. To avoid any duplication of recovery, the Court is explicitly indicating that no award is made under Title VII. The award under the Iowa Civil Rights Act encompasses all of the harassment back through at least 1992, the date of the initial Wisecup incident. The award is intended to compensate the plaintiff for the emotional distress caused by the sexual assault by Mr Wisecup, the harassment by co-employees, and the treatment of her by her supervisor, Frank Eisermann.

In considering all the evidence, this Court concludes that a fair and appropriate award of emotional distress damages in this case is in the amount of $200,000, and that amount will be included in the ultimate award made to the plaintiff as part of this case. *See, e.g., Madison,* 257 F.3d at 802–03 (finding jury award of $266,750 for emotional distress damages "not excessive in light of the evidence or when compared to awards in similar cases," and citing *Wilmington v. J.I. Case Co.,* 793 F.2d 909, 922 (8th Cir.1986) ($400,000 jury award for emotional distress was affirmed where the evidence showed "a deterioration in [the plaintiff's] health, mental anxiety, humiliation, and emotional distress resulting from the conditions under which he worked . . . and from his discharge"), *Ross v. Douglas Cty.,* 234 F.3d 391, 397 (8th Cir.2000) ($100,000 award for emotional distress not excessive where victim of discrimination suffered emotional and financial strain after leaving hostile work environment where he was taunted with racial epithets), and *Passantino v. Johnson and Johnson Consumer Prod., Inc.,* 212 F.3d 493, 503, 513–14 (9th Cir.2000) (affirming $1 million emotional distress award for sexual harassment where plaintiff "worried, cried, and felt trapped and upset," spent less time with her family, suffered stomach problems, rashes and headaches, and sought counseling with her pastor)). Essentially, the entire award is for past emotional distress damages. This Court believes that once this litigation is resolved and the plaintiff receives the vindication that she is entitled to under this decision, the emotional distress will be greatly alleviated. Consequently, the Court is allocating none of the emotional distress damage award for future emotional distress.

### 3. Punitive damages

"Punitive damages are allowed under Title VII if the defendant discriminated 'with malice or with reckless indifference to the federally protected rights of an aggrieved individual.'" *Beard,* 266 F.3d at 800 (citing 42 U.S.C. § 1981a(a)(1), (b)(1)); *accord Madison,* 257 F.3d at 794; *see generally Kolstad v. American Dental Ass'n,* 527 U.S. 526, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999) (outlining parameters of punitive damage analysis under Title VII). "The terms 'malice' or 'reckless indifference' pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." *Kolstad,* 527 U.S. at 535, 119 S.Ct. 2118, *quoted in Ogden,* 214 F.3d at 1008. To impute liability for punitive damages to the employer, the plaintiff must show that "an employee serving in a 'managerial capacity' committed the wrong while 'acting in the scope of employment.'" *Ogden,* 214 F.3d at 1008–09 (quoting *Kolstad,* 527 U.S. at 543, 119 S.Ct. 2118, in turn citing Restatement (Second) of Agency § 217C). The "scope of employment" requirement is to be interpreted broadly:

"[I]ntentional torts are within the scope of an agent's employment if the conduct is 'the kind [the employee] is employed to perform,' 'occurs substantially within the authorized time and space limits,' and 'is actuated, at least in part, by a purpose to serve the' employer. [S]o long as these rules are satisfied, an employee may be said to act within the scope of employment even if the employee engages in acts 'specifically forbidden' by the employer and uses 'forbidden means of accomplishing results.'" *Kolstad,* 527 U.S. at 543–44, 119 S.Ct. 2118 (citing Restatement (Second) of Agency, §§ 228, 230).

*Ogden,* 214 F.3d at 1009.

An employer may escape vicarious liability for the discriminatory employment decisions of managerial agents where those decisions are contrary to the employer's "good faith efforts to comply with Title

VII." *Ogden,* 214 F.3d at 1009 (citing *Kolstad,* 527 U.S. at 545, 119 S.Ct. 2118). What measures constitute "good faith efforts" was not prescribed by the *Kolstad* Court; rather, the Court stated only that "Title VII is designed to encourage the creation of anti-harassment policies and effective grievance mechanisms" and "the purposes underlying Title VII are similarly advanced where employers are encouraged to adopt anti-discrimination policies and to educate their personnel on Title VII's prohibitions." *Kolstad,* 527 U.S. at 545, 119 S.Ct. 2118, *quoted in Ogden,* 214 F.3d at 1009.

■ In this case, the Court finds that the plaintiff has demonstrated that an award of punitive damages is appropriate. In this respect, the Court notes that the Eighth Circuit Model Jury Instructions characterize the plaintiff's burden of proof on punitive damages in a Title VII action as the "preponderance or greater weight of the evidence" standard. *See* Instruction Number 5.04, Eighth Circuit Manual of Model Jury Instructions, Civil (2001). However, even under the more exacting "clear and convincing" standard, the Court's analysis and conclusions would remain the same.

As detailed in the Court's factual findings, the plaintiff repeatedly made complaints to IBP managerial employees about the conduct to which she was subjected. Those complaints were for the most part ignored or, in some cases, she was lied to about the results of the investigation. Specifically, the Court has previously found that following Ms. Flockhart's complaint regarding the sexual assault against her by Mr. Wisecup, and Mr. Wisecup's admission with regard to her claims, she was falsely told that he had denied the allegations and they could not be substantiated.

The Court also finds that IBP's attitude concerning the incidents with Mr. Eiser-

mann, as most notably evidenced by Mr. Schmitz's comments to Mr. Gordon that nothing would be done about Mr. Eisermann, warrant the award of punitive damages. Mr. Schmitz's comments reflect, and are consistent with, the pervasive atmosphere of harassment and degradation of women at the IBP plant. The evidence is overwhelming that at IBP's Waterloo plant, sexual harassment complaints were not taken seriously and little, if any, effort was made to address legitimate concerns.

IBP's argument that it has an effective employment discrimination policy which shields it from liability for punitive damages is thoroughly refuted by the evidence. Although IBP has a written policy, it was rarely enforced, and certainly, as applied to Ms. Flockhart, a total failure. It is undisputed that Ms. Flockhart made repeated complaints to IBP management as required under the anti-discrimination policy. Yet, those complaints were never acted upon. In addition, the policy clearly provides that all complaints are to be investigated and documented. Ms. Ott testified that it is the policy of IBP, as outlined in its training materials, to "document, document, document." Yet, IBP was unable to produce any documentation concerning any of the numerous complaints made by Ms. Flockhart. This is either a gross violation of IBP's own policy, or worse, a deliberate attempt to hide the facts of the Wisecup and other investigations which would support Ms. Flockhart's allegations. *See Ogden,* 214 F.3d at 1010 (affirming a jury award of punitive damages and noting that evidence of a written sexual harassment policy, and policy of encouraging employees with grievances to contact the home office " 'does not suffice, as a matter of law,' to establish 'good faith efforts' in the face of substantial evidence that the company 'minimized' [the plaintiff's] complaints; performed a cursory investigation which

focused upon [the plaintiff's] performance, rather than [the harasser's] conduct; and forced [the plaintiff] to resign while imposing no discipline upon [the harasser] for his behavior") (citing *Deffenbaugh–Williams v. Wal–Mart Stores, Inc.*, 188 F.3d 278, 286 (5th Cir.1999) (Wal–Mart's policy of encouraging employees to contact management with grievances did not suffice to establish good faith efforts as a matter of law, in light of Wal–Mart's failure to respond effectively to plaintiff's complaints)).

In this respect, the Court notes the striking similarities between the way the plaintiff was treated in this case and the conduct outlined in *Madison v. IBP, Inc.*, 257 F.3d 780 (8th Cir.2001). In affirming a jury award of punitive damages in that case, the Court of Appeals for the Eighth Circuit found "a great deal of evidence from which the jury could find that IBP employees in a managerial capacity acted with malice or reckless disregard" of the plaintiff's civil rights. *Id.* at 795. This included evidence that supervisors and managers were among those who harassed and abused her; evidence that high level managerial employees ignored her complaints about illegal harassment and discrimination, failed to investigate her allegations, and did not document alleged illegal behavior or discipline perpetrators; and evidence that IBP's written policies on sexual harassment were not carried out or effectively implemented. *See id.* at 795–96. The same deficiencies warrant similar consideration and treatment here.

In summary, the Court believes that only a substantial award of punitive damages in this case will ensure that IBP takes seriously its obligations towards its female employees and implements the policies it claims are in force. Accordingly, the Court will award the statutory maximum punitive damage award allowed under Title VII: $300,000 in punitive damages will be assessed against IBP.

### D. *Interest*

■ Judge Celeste Bremer has very thoroughly outlined the law on the award of prejudgment interest under both Title VII and the Iowa Civil Rights Act. See *Madison v. IBP, Inc.*, 149 F.Supp.2d 730, 782 (S.D.Iowa 1999). Consistent with the applicable guidelines discussed in *Madison*, the Court will award prejudgment interest on the award of back pay and emotional distress damages at the statutory rate set forth in Iowa Code § 668.13(3), with interest accruing from the date of the commencement of this action to the date of the entry of judgment. No prejudgment interest will be awarded on the punitive damage portion of the judgment.

Post-judgment interest is government by 28 U.S.C. § 1961. Interest shall accrue on the entire award, including punitive damages, from and after the entry of judgment at the federal judgment rate.

### E. *Attorneys' Fees and Equitable Relief*

The plaintiff has requested equitable relief in this case. The Court believes that such relief may very well be appropriate. In light of the documented failure of IBP to have an effective and meaningful anti-harassment policy, the Court will give serious consideration to granting equitable relief which will force IBP to implement such a policy.

The Court is aware that many of the events that were testified to in this case occurred several years ago. There is testimony, however, that many of the deficiencies in IBP's anti-harassment policy continued up until the date of trial. That said, the Court does not believe it is in a position to adequately address the issue of equitable relief without the benefit of a further evidentiary hearing as to IBP's

current employment policies and any proposed changes. This Court would admonish IBP to be proactive in this regard and would strongly suggest it be prepared to address what even it concedes are deficiencies in the way Ms. Flockhart's complaints were investigated and addressed.

The plaintiff, as a prevailing party, is presumptively entitled to attorneys' fees. *See Kline v. City of Kansas City, Missouri, Fire Dept.*, 245 F.3d 707, 708 (8th Cir.2001) ("[U]nder Title VII of the Civil Rights Act of 1964, ... the trial court, 'in its discretion,' may award 'a reasonable attorney's fee' to the prevailing party, *see* 42 U.S.C. § 2000e-5(k). A prevailing plaintiff ordinarily is to be awarded attorney's fees in all but special circumstances.") (citations omitted). The Court intends to take up the issue of the attorneys' fees incurred and awardable to date, together with the hearing on equitable relief.

### F. *Other Issues.*

To the extent there are any other defenses or issues raised by the defendant which have not been explicitly addressed in this Order, those defenses are denied. Specifically, all grounds asserted by the defendant in support of its motion for judgment as a matter of law at the close of the plaintiff's case, and again at the close of all the evidence, are denied.

The plaintiff forwarded to the Court a number of exhibits after the completion of trial, including a tape of a conversation involving Mr. Gordon. (Exhibits 555 and 556). The defendant objects to the introduction of any of those exhibits into evidence. The Court finds the exhibits to be irrelevant and more prejudicial than probative. They are not admitted and have not been considered in the Court's decision.

The Court is also denying the plaintiff's motion for sanctions for discovery abuses in this case. An issue that consumed an unnecessary amount of time at trial in this case related to IBP's failure to comply with the magistrate judge's discovery orders, or, literal compliance without making a meaningful effort to comply with its obligation under the discovery rules or the spirit of Magistrate Judge Jarvey's discovery orders. One such issue that consumed an inordinate amount of time was IBP's response to the plaintiff's legitimate request for documentation concerning complaints made by other females at the Waterloo IBP plant. IBP went from initially claiming it had no such records (other than complaints that resulted in actual filings with city, state, or federal EEO officials) to a position that they were contained in various notebooks, to a position they were intermingled with thousands of other incident reports in various banker boxes at the Waterloo plant. In addition, the plaintiff very specifically asked for copies of complaints maintained at corporate headquarters that were prepared in response to calls made on the toll free number to the corporate EEO office. The evidence at trial showed that even after years of litigation, IBP has still not done a thorough search to determine how many, if any, of those complaints may be in existence at the corporate offices. Although this Court found many of the discovery issues to be extremely frustrating, it is also the ultimate conclusion of the Court that no sanctions should be imposed. The Court does note, however, that is will not be overly sympathetic to IBP if it argues in opposition to any fee application in this case that the plaintiff's attorneys spent an excessive amount of time on discovery issues. Likewise, the Court will consider IBP's deficiencies in its record keeping system that led to many of the discovery disputes in connection with the award of any equitable relief.

### III. Summary

In summary, the Court finds that the plaintiff has proven by a preponderance of the evidence that she was constructively discharged from IBP, Inc. In addition, the plaintiff has proven by clear and convincing evidence that she is entitled to punitive damages. Finally, the Court finds that the plaintiff has failed to prove an Equal Pay Act violation.

The Court will award damages for back pay in the total amount of $37,851, emotional distress damages in the amount of $200,000, and punitive damages in the amount of $300,000. Prejudgment interest shall be awarded on the back pay and emotional distress damages from the date of the filing of this lawsuit to the date of the entry of judgment at the statutory rate set out in Iowa Code § 668.13(3). The award of back pay is made under both Title VII and the Iowa Civil Rights Act; the emotional distress damages are made pursuant to the Iowa Civil Rights Act; and the punitive damages award is made pursuant to Title VII. The Court is awarding no damages for front pay or future emotional distress.

Finally, the Court will set a hearing by separate notice to take up the issues of equitable relief and attorneys' fees.

### ORDER

IT IS THEREFORE ORDERED that judgment shall enter in favor of the plaintiff and against the defendant in the total sum of $237,851, plus interest from the date of the filing of this complaint to the date of the entry of the judgment at the Iowa judgment rate. Judgment shall also enter in favor of the plaintiff and against the defendant for $300,000 in punitive damages without interest. Interest on the total award shall accrue from and after the date of the entry of the judgment at the federal judgment rate. The plaintiff shall recover her costs of this action.

IT IS FURTHER ORDERED that judgment shall enter in favor of the defendant on the plaintiff's Equal Pay Act claim.

IT IS FURTHER ORDERED that a hearing on the award of equitable relief shall be set by separate notice.